IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **DANIEL SNYDER,** | Case No. 3:22-cv-27-RGE-SBJ |
| **Plaintiff,** | |
| v. | **Jury Trial Requested** |
| **ARCONIC, CORP., a Delaware Corporation, and ARCONIC DAVENPORT LLC, a Delaware Corporation,** | |
| **Defendant.** | |

## AMENDED COMPLAINT

Plaintiff, Daniel Snyder ("Mr. Snyder" or "Plaintiff"), files this Complaint against Defendant Arconic, Corp., a Delaware corporation, and Defendant Arconic Davenport LLC, a Delaware corporation (hereinafter "Arconic" or "Defendant") and states as follows:

## INTRODUCTION

1. Plaintiff Daniel Snyder, now 63, worked as a loyal employee at Arconic for approximately 10 years, advancing to the position of "lead operator." Arconic is an industrial company specializing in lightweight metal engineering and manufacturing.[1] In June 2021, in attempting to respond to an anonymous company survey, Mr. Snyder briefly commented that the company's use of the rainbow to promote "Gay Pride Month" was "an abomination to God," as the rainbow "is not meant to be a sign for sexual gender."

2. Arconic informed Mr. Snyder that his comment had been posted publicly on the company "intranet"—which was not Mr. Snyder's intent—and that it had offended a fellow

---

[1] https://en.wikipedia.org/wiki/Arconic.

1

employee. Mr. Snyder was summarily suspended and then terminated, allegedly for violating the company's "diversity policy."

3. Before his termination, Mr. Snyder informed Arconic representatives that he made his statement based on his sincerely held Christian beliefs; that his intent had been to respond to the anonymous survey (whereupon he was met with derisive laughter by a panel of Arconic representatives); and that he would never "give his opinion to their solicitations" again.

4. Arconic ignored this information from Mr. Snyder, including the religious nature of his stated beliefs.

5. Arconic treated Mr. Snyder as a bigot, even though the Supreme Court recently "emphasized" that in today's age, "those who adhere to religious doctrines[] may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015).

6. In operation, therefore, Arconic's "diversity policy" actually punishes diversity of opinion, allowing only one opinion—the company's approved narrative on morally freighted issues—while treating any employee's religious opinion or objection to the contrary, even if intended to be anonymous and expressed in a single instance, as grounds for immediate termination with no accommodation whatsoever. The "zero tolerance" "diversity policy" is in fact an intolerance policy designed to expel from Arconic's workforce anyone who dissents for religious reasons from its corporate moral views, without the opportunity for reasonable accommodation, and is thus a per se violation of Title VII.

## **NATURE OF THE CASE**

7. This is a civil action whereby Plaintiff Mr. Snyder seeks compensatory and punitive damages pursuant to 42 U.S.C. § 1981a, attorney fees pursuant to 42 U.S.C. § 2000e-

5(k), and injunctive relief pursuant to 42 U.S.C. § 2000e-5(g), against Arconic for religious discrimination and retaliation because of his religion under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act ("ICRA"), Iowa Code § 216.1 *et seq.*

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Mr. Snyder is pursuing relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for religious discrimination and retaliation by Arconic. This Court has jurisdiction to order the requested relief pursuant to 42 U.S.C. § 1981a and 42 U.S.C. § 2000e-5(g) and (k).

9. This Court has supplemental jurisdiction over Mr. Snyder's parallel claims under ICRA, Iowa Code § 216.1 *et seq.*, pursuant to 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Defendant because Defendant maintains continuous and systematic business activity in this District, specifically at Defendant's plant in Riverdale, Iowa, where Mr. Snyder worked; Defendant Arconic Davenport LLC is also a registered corporation in this District.

11. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant's wrongful acts and omissions giving rise to Plaintiff's claims occurred in this District, where Defendant maintains its Riverdale, Iowa plant; where Defendant Arconic Davenport LLC is a registered corporation; and where Defendant is subject to this Court's personal jurisdiction.

## FACTS

12. Mr. Snyder began working for Aronic in 2011, and he was a valuable and dedicated employee for the ensuing 10 years. At all relevant times to the allegations in this

Complaint, Arconic is an employer maintaining a minimum of 15 employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. § 2000e(b), (g), and (h).

13. On June 1, 2021, Mr. Snyder received an email from Arconic CEO Tim Myers inviting employees to respond to the company's first-ever "Engagement Survey," which sought employee feedback on company performance and ways it could improve. The email stated that "responses would be anonymous."

14. During his work shift on June 3, Mr. Snyder attempted to respond to the official survey by clicking a link in the email from CEO Myers. He was directed to a company webpage displaying a rainbow flag in promotion of "Gay Pride Month" for the month of June. Mr. Snyder had also observed similar promotions in the beginning of that month on the electronic sign outside the building where Mr. Snyder worked, and in the company's newsletter for the month of June.

15. In observing the webpage promotion of "Gay Pride Month" through use of the rainbow, Mr. Snyder believed it was part of the anonymous survey seeking feedback about the topic.

16. The URL at the top of the webpage was as follows: "https/arconic.sharepoint.com/sites/Arconnect/sitePages/<u>We'd-like-your-input-on-building-a-great-future-tog</u>..." (emphasis added).

17. Mr. Snyder saw a space where he could comment. He thus typed and submitted the following brief statement: "It[']s an abomination to God. Rainbow is not meant to be displayed as a sign for sexual gender."

18. Mr. Snyder's statement was explicitly and facially religious. Indeed, as he would soon inform Arconic (*see infra*), Mr. Snyder's sincerely held Christian beliefs include the

understanding that the Bible teaches marriage is only between one man and one woman. He also sincerely believes that the Bible shows that the rainbow is a sign of the covenant between God and man, and thus that it is sacrilegious to use the rainbow to promote relationships and ideologies that violate God's law.

19. At the same time, and because of his Christian beliefs, Mr. Snyder respects all people regardless of their sexuality, and he previously worked alongside a transgender individual at Arconic without any issues.

20. Arconic had previously acknowledged Mr. Snyder's religious faith, having granted him a religious accommodation to not work on Sundays so he could preach at a local church service in his capacity as a part-time pastor. (Eventually his preaching duties ended and he no longer sought this accommodation.)

21. Mr. Snyder also previously sought, and had been denied, permission to start a formal prayer group. Mr. Snyder also sometimes prayed with co-workers in his office, including with managerial employees.

22. Thus, Arconic was plainly aware that Mr. Snyder was a sincerely and deeply religious person, even before he made his explicitly religious comment about the rainbow on June 3.

23. On June 8, during Mr. Snyder's next scheduled shift after his June 3 comment, his supervisor informed him that he was being suspended for three days as a result of that comment. Mr. Snyder was escorted to a meeting with Human Resources, where he was told by the supervisor that his statement had offended a fellow employee.

24. Mr. Snyder stated that he believed his comment had been in response to the anonymous survey and would be seen only by the sender of that survey, and not by fellow

employees. But his supervisor said the comment had been posted to a "message board." Mr. Snyder was shocked and said he didn't know how that happened. He also asked his supervisor and HR representative if the company's diversity policy protected the expression of *his* religious beliefs or protected him from the offense he felt in the cultural appropriation of God's symbol, as established in Scripture. The supervisor and HR representative did not respond.

25. That same day, Mr. Snyder received an "Employee Personal Report" signed by his supervisor and union representative, stating that he was being suspended for three days beginning on June 11, with the possibility of receiving "further disciplinary action up to and including discharge," for violating Arconic's "diversity policy." Mr. Snyder refused to sign the same form.

26. The report pinpointed Mr. Snyder's violation as "ma[king] an offensive comment on the company intranet."

27. The next day, on June 9, Mr. Snyder returned for his next scheduled shift, but he was again escorted to HR because of the June 3 statement. There, Mr. Snyder reiterated that he believed he had been responding to the anonymous survey, and that the company was not considering his feelings and religious beliefs in using the rainbow to promote "Gay Pride Month." He also added: "If any one of you in this meeting believes in God, you know that my statement is true." He was quickly asked to leave, and he obliged.

28. On June 10, in an email exchange with his union representative, Mr. Snyder said that while he would never take back what he said, at the same time, "I will never take place [sic] in any of their surveys or give my opinion to their solicitations" again.

29. Neither his union representative nor anyone from the company acknowledged this statement, or, for that matter, made *any effort to engage with Mr. Snyder about reasonably*

*accommodating his religious statement, and corresponding religious beliefs, about using the rainbow to promote "Gay Pride."*

30. On June 12, Arconic informed Mr. Snyder during a teleconference that it had decided to fire him. Mr. Snyder was then allowed to attend two additional "grievance hearings," including a "Level 3" hearing on June 30.

31. At the Level 3 grievance hearing on June 30, Mr. Snyder explained to a panel of company representatives that he believed his June 3 comment had been in response to the anonymous survey. A number of representatives on the panel then laughed out loud at him, clearly intending to publicly humiliate him. Mr. Snyder indeed felt publicly humiliated and later complained about the panel's laughter to his union representative.

32. Mr. Snyder also reiterated at that hearing that his June 3 statement was based on his sincerely held religious beliefs about what the Bible teaches about the rainbow and sexuality. One of the company representatives responded that he "reads the Bible, too," thus confirming the company's actual awareness that Mr. Snyder's June 3 statement derived from his sincerely held religious beliefs based on his view of the Bible. When Mr. Snyder then asked the same representative what he thought the Bible teaches about using the rainbow to promote "Gay Pride Month," the representative did not respond.

33. As a result of the Level 3 grievance hearing, Mr. Snyder's employment remained terminated.

34. Notably, Mr. Snyder is aware that some former co-workers at Arconic with prior infractions against Arconic policies have committed actual acts of physical workplace disruption while working there, without ultimately losing their jobs, further highlighting the discriminatory nature of Mr. Snyder's termination.

35.     Also notably, Arconic's "diversity policy" provides that, "We have zero tolerance for" alleged "discrimination intimidation [sic], harassment, or retaliation of any kind."[2] But Mr. Snyder's one-time comment—that he intended to be anonymous and private; that he did not direct at any particular co-worker; and that commented only on Arconic's improper use of the rainbow and not on any protected class—was not in any way "discrimination intimidation [sic], harassment, or retaliation," and thus did not actually violate Arconic's policy in the first place. On the other hand, Arconic's conduct toward him was all of those things.

36.     Mr. Snyder is not aware of any other Arconic employee who has previously been terminated for violating its "diversity policy."

37.     Arconic's "diversity policy" also makes no mention of Arconic's federal-law obligation to "reasonably accommodate" any aspect of an employee's sincerely held religious beliefs where feasible, 42 U.S.C. § 2000e(j), notwithstanding the company's internal "zero tolerance" policy to the contrary. The diversity policy thereby fails to protect a diversity of viewpoints in the workplace, including religious viewpoints.

38.     After his termination, Mr. Snyder diligently pursued subsequent employment but initially struggled to find work. He forthrightly informed prospective employers, upon their request, that he had been fired from his previous job at Arconic. He was therefore turned down for numerous positions, exacerbating the humiliation and other mental and emotional distress he experienced as a result of his termination (including Arconic representatives' derisive laughter at him during his Level 3 grievance hearing).

---

[2] https://www.arconic.com/human-rights/#:~:text=We%20also%20believe%20that%20diversity,or%20discrimination%20in%20any%20form.

39. Mr. Snyder was finally able to obtain subsequent employment in September 2021, as an assembly line worker at John Deere. He even timely pursued an internal opening to become a welder for slightly higher pay, which position he began in February 2022 after months of training.

40. However, Mr. Snyder's new job pays significantly less than his job at Arconic. It also requires him to stand throughout most of his shift, which is especially physically taxing at 63 years old, whereas his more advanced position at Arconic allowed him to perform significant duties while seated in his office. He also has not been called on to work any overtime hours at John Deere, whereas he worked approximately 50 hours of overtime per month at Arconic. His medical benefits are also materially reduced at John Deere compared to his medical benefits at Arconic.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

41. Mr. Snyder timely filed an employment discrimination charge on June 17, 2021, with the Iowa Civil Rights Commission ("Commission" or "Iowa Commission"). On August 31, 2021, the Commission administratively closed Mr. Snyder's claim for lack of "reasonable probability of a probable cause determination."

42. The Iowa Commission's conclusion was based on a manifestly erroneous analysis of the facts and law. According to the Commission's "Preliminary Case Review," Arconic's "reasons" for terminating Mr. Snyder included the following:

- Mr. Snyder "was not responding to a pride month email and [] was not asked to provide his opinion, when he posted the comment";

- The company's diversity policy still applied to Mr. Snyder's comment;

- Mr. Snyder "had two other recent diversity policy infractions," both in 2020: one for allegedly yelling at a COVID-19 screening nurse, and one for allegedly yelling at his supervisor;[3] and

- "At no time during [his] meeting with HR did [Mr. Snyder] request a reasonable accommodation."

43. The Commission thus concluded that Arconic had a legitimate, nondiscriminatory reason for its adverse actions against Mr. Snyder—specifically, that Mr. Snyder did not deny that he made the statement in question; the statement violated Arconic's diversity policy; and Mr. Snyder was also terminated for having received two prior disciplinary actions in 2020.

44. Mr. Snyder then timely requested review by the Equal Employment Opportunity Commission. The EEOC then issued a right-to-sue letter to Mr. Snyder, which he received on February 18, 2022.

45. Mr. Snyder now timely files this lawsuit within 90 days of receiving his right-to-sue letter.

### CAUSES OF ACTION

### COUNT I
**Discrimination on the Basis of Religion in Violation of  
Title VII of the Civil Rights Act of 1964.**

46. Plaintiff hereby incorporates the foregoing paragraphs as if restated herein.

---

[3] Mr. Snyder strongly disputes Arconic's description of these incidents and that they actually violated company policy. In the first incident, Mr. Snyder was talking cordially with a COVID-19 screening nurse about the possibility of doing temperature checks on his outstretched wrist instead of his forehead, causing a nearby medical supervisor to begin yelling at Mr. Snyder that no alternatives were available and not to question his authority. In the second incident, a recently hired supervisor breached the mandatory safe zone while Mr. Snyder was operating heavy machinery in order to yell at Mr. Snyder to put on his COVID-19 mask. Upon seeing the supervisor's dangerous breach, Mr. Snyder yelled back—over the noise of loud machinery—to immediately get out of the safe zone. However, under blackletter discrimination law, these incidents are legally irrelevant given that Arconic admits it also terminated Mr. Snyder because of his religious statement on June 3.

47. Title VII of the 1964 Civil Rights Act forbids employers from "discharg[ing] . . . or otherwise discriminat[ing] against any individual . . . *because of* such individual's . . . religion." 42 U.S.C. § 2000e-2(1) (emphasis added).

48. Under Title VII, "religion" "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

49. Defendant engaged in adverse employment action against Mr. Snyder by suspending and then firing him "because of" his religion, in violation of Title VII.

50. Defendant suspended and fired Mr. Snyder because of his religion by suspending and firing him for making a single, expressly religious comment about his religious views on Arconic's use of the rainbow to promote of "Gay Pride Month."

51. Defendant's conduct violated Title VII because Title VII "requires otherwise neutral policies" like Arconic's diversity policy "to give way to the need for accommodation" if feasible "without an undue hardship." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015).

52. Defendant had reason to be aware, and was aware, that Mr. Snyder's expressly religious comment was an "aspect" of his religious beliefs about the rainbow. Mr. Snyder's comment expressly stated that displaying the rainbow for this purpose was an "abomination to God," a quintessentially religious assertion. Further, Mr. Snyder informed Arconic of the statement's religious motivations in three separate meetings (i.e., "grievance hearings"), as acknowledged by one Arconic representative's response that he "reads the Bible, too."

11

53. Defendant entirely failed to engage with Mr. Snyder about reasonably accommodating his religious statement, and corresponding religious beliefs, despite having far more than an "unsubstantiated suspicion" that he may need a religious accommodation. *Abercrombie & Fitch*, 575 U.S. at 773 (holding that an employee need not request a reasonable accommodation for her religious beliefs or practices as long as the employer has at least an "unsubstantiated suspicion that an accommodation would be needed").

54. Defendant's adverse actions against Mr. Snyder without engaging in any legitimate effort to accommodate any aspect of his religious beliefs violated Title VII. Mr. Snyder is entitled to relief for this reason alone.

55. Even if Defendant had legitimately attempted to reasonably accommodate Mr. Snyder (which it did not), there would have been no "undue hardship" to Defendant. Indeed, Mr. Snyder informed Arconic multiple times that he believed his religious statement had been in response to the anonymous survey and thus would not be seen by fellow employees. And even if it were not an accident, Mr. Snyder informed his union representative that he had no desire to "give my opinion to their solicitations" on this or any other issue ever again.

56. Defendant violated Title VII by suspending and then terminating Mr. Snyder's employment for the foregoing reasons despite also allegedly terminating him for two other alleged violations of its diversity policy in 2020. Title VII's "because of" test "incorporates . . . the traditional but-for causation standard," which "means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision, . . . [if] the plaintiff's [religion] was one but-for cause of that decision." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020).

57. Defendant's unlawful employment discrimination is the direct and proximate cause of Mr. Snyder's deprivation of equal employment opportunities and ongoing economic and non-economic damages. Defendant's unlawful conduct has caused Mr. Snyder damages, including lost wages, future loss of income, job search expenses, physical anguish, shame, anxiety, humiliation, and other mental and emotional distress, including as a result of a grievance hearing panel laughing out loud at him to publicly humiliate and intimidate him.

58. Defendant intentionally engaged in its discriminatory actions with malice or reckless indifference to Mr. Snyder's protected civil rights. Defendant is thus liable for punitive damages to Mr. Snyder, as well.

## COUNT II
### Retaliation in Violation of 42 U.S.C. § 2000e-3(a)

59. Plaintiff hereby incorporates paragraphs 1 through 45 as if restated herein.

60. Title VII prohibits retaliation against an employee for opposing unlawful employment actions under Title VII. Specifically, 42 U.S.C. § 2000e-3(a) makes it unlawful "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter."

61. Mr. Snyder plainly opposed Defendant's adverse actions taken against him by explaining, in three separate meetings with Arconic representatives, that his June 3 statement was based on his sincerely held Christian beliefs, and that Arconic was wrongfully discriminating against him by not being considerate of his feelings and religious beliefs, while purporting to be protective of an anonymous employee who allegedly found the June 3rd statement to be "offensive."

62. In part for this reason, Mr. Snyder refused to sign the "Employee Personal Report" memorializing his suspension for allegedly making an "offensive comment" in violation of the company's "diversity policy."

63. Defendant terminated Mr. Snyder not only because of his June 3 religious statement, but because Mr. Snyder expressed opposition to Defendant's failure to be considerate of his religious beliefs in its ubiquitous use of the rainbow symbol to promote "Gay Pride Month," and in disciplining him for his June 3 religious statement. Indeed, one Arconic representative even said that he "reads the Bible, too"—further indicating that in Defendant's view, Mr. Snyder's opposition to Defendant's use of the rainbow without being considerate of his religious beliefs, and his opposition to being disciplined for his corresponding religious statement, were themselves grounds for termination.

64. Defendant's unlawful retaliation is another direct and proximate cause of Mr. Snyder's deprivation of equal employment opportunities and ongoing economic and non-economic damages. Defendant's unlawful conduct has caused Mr. Snyder damages, including lost wages, future loss of income, job search expenses, physical anguish, shame, anxiety, humiliation, and other mental and emotional distress, including as a result of a grievance hearing panel laughing out loud at him.

65. Defendant intentionally engaged in retaliation against Mr. Snyder with malice or reckless indifference to Mr. Snyder's federally protected rights. Defendant is thus liable for punitive damages to Mr. Snyder, as well.

### COUNT III
### Discrimination on the Basis of Religion in Violation of ICRA, Iowa Code § 216.1 *et seq*.

66. Plaintiff hereby incorporates paragraphs 1 through 45 as if restated herein.

67. Like Title VII, Iowa Code § 216.6 prohibits employers from discriminating against employees "because of . . . religion." Iowa courts "apply the same framework to analyze claims brought under ICRA." *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073, 1083 (N.D. Iowa 2020).

68. Accordingly, Plaintiff incorporates paragraphs 46 through 58 of this Complaint as if restated herein, as the same conduct entitles Mr. Snyder to relief under Iowa Code § 216.6.

## COUNT IV
### Retaliation in Violation of ICRA, Iowa Code § 216.11(2)

69. Plaintiff hereby incorporates paragraphs 1 through 45 as if restated herein.

70. Like Title VII, Iowa Code § 216.11(2) makes it unlawful for an employer "to discriminate or retaliate against" an employee "because such person has lawfully opposed any practice forbidden under this chapter." Iowa courts also apply a similar framework as Title VII to ICRA retaliation claims. *Garang*, 439 F. Supp.3d at 1097.

71. However, whereas Title VII retaliation claims require showing but-for causation, ICRA retaliation claims require showing the plaintiff's protected conduct was merely a "motivating factor" in the adverse employment action. *Id.*

72. Accordingly, Plaintiff incorporates paragraphs 59 through 65 of this Complaint as if restated herein, as the same conduct a fortiori establishes motivating-factor retaliation by Defendant in violation of Iowa Code § 216.11.

## REQUESTED RELIEF

WHEREFORE, Mr. Snyder requests that judgment be entered in his favor ordering the following relief:

1. Reversal of Mr. Snyder's termination and restoration to his previous or a comparable position;

2. Back pay, with interest;

3. Front pay (if not restored to employment with Defendant);

4. Punitive damages;

5. Reasonable attorney fees;

6. An injunction ordering Defendant to require that, in accord with Title VII and ICRA, employees respect each other's religious views, and to require the provision of counseling to employees and management to avoid religious discrimination and harassment in the workplace; and

7. Any other relief this Court deems proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all triable issues.

    Respectfully submitted,

    */s/ Matthew F. Heffron*
    Matthew F. Heffron, Iowa Bar No. AT0003463
    Martin A. Cannon*
    Michael G. McHale*
    THOMAS MORE SOCIETY
    10506 Burt Circle, Ste. 110
    Omaha, NE, 68114
    (402) 501-8586
    mheffron@thomasmoresociety.org
    mcannonlaw@gmail.com
    mmchale@thomasmoresociety.org
    *Counsel for Mr. Snyder*

    **Pro Hac Vice* applications pending