IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| DANIEL SNYDER,<br><br>    Plaintiff,<br><br>vs.<br><br>ARCONIC CORP., a Delaware Corporation, and ARCONIC DAVENPORT LLC, a Delaware Corporation,<br><br>    Defendants. | No. 3:22-cv-0027-SHL-SBJ<br><br><br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

When a conflict exists between an employee's religious practices and an employer's policies, state and federal law require the employer to make an accommodation unless it would cause undue hardship. In the absence of a conflict, however, the law does not require the employer to give preferential treatment to an employee who violates a religiously neutral policy even if the violation is motivated by religious beliefs, particularly if the employer has no reason to believe, in advance, that an accommodation is needed. Here, Plaintiff Daniel Snyder's employer concluded that he violated a religiously neutral anti-harassment policy by posting a message on a widely accessible intranet page stating that it is an "abomination to God" to use a rainbow symbol in connection with diversity initiatives. As Snyder has not identified any religious belief or practice that required him to post his message, and as there is no evidence that he placed his employer on notice that he needed an accommodation from company policy prior to violating it, he has failed as a matter of law to establish a prima facie case for religious discrimination. The Court therefore DENIES Snyder's Motion for Partial Summary Judgment and GRANTS Defendants' Motion for Summary Judgment.

I.    **Statement of Facts.[1]**

Defendant Arconic Corp. ("Arconic") is an aluminum supply chain company that employs tens of thousands of people worldwide and approximately 2,500 people at its plant in Davenport,

---

[1] When cross-motions for summary judgment are filed, the Court must view the facts in the light most favorable to the plaintiff on the defendant's motion and in the light most favorable to the defendant on the plaintiff's motion. *See Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019). Consistent with this dichotomous standard, this section deals with genuine factual disputes by separately stating what each of Snyder and Arconic allege. Undisputed facts are stated without attribution to either side.

Iowa. (ECF 24-1, ¶ 5.) Plaintiff Daniel Snyder ("Snyder") worked for Arconic in Davenport for approximately ten years, rising to the level of "lead operator" by age 62. (Id., ¶ 4.) During his employment, Arconic granted Snyder a religious accommodation allowing him not to work on Sundays so he could preach at a local church. (ECF 25-1, ¶ 2.)

On June 1, 2021, Arconic CEO Tim Myers sent an email to many Arconic employees, including Snyder, with the subject line, "We'd like your input…." (ECF 24-1, ¶ 6.) The email invited employees to respond to an "Engagement Survey," which sought employee feedback on "identifying areas where we can improve." (Id.) The email stated that "responses would be anonymous." (Id.) The email said the survey would launch on June 2, when employees with email addresses would receive a link from the survey administrator. (Id.)

The same day, an article with identical substance to Myers's email was posted to Arconic's intranet page. (Id., ¶ 7.) The article included a large bold headline stating, "We'd like you[r] input on building a great future together" and stating that responses would be anonymous. (Id.) The article included a hyperlink at the bottom. (Id.) Employees accessed the article by clicking on a "tile" on the company homepage with CEO Myers's image next to the words, "We'd like your input on building a great future together." (Id., ¶ 8.) Immediately next to that tile were two additional tiles: one stating "Arconic Inclusion and Diversity Efforts 4 Highlighted by the Manufacturing Institute," and the other stating, "SPECTRUM: Arconic Employees for LGTBQ+ Equality" next to a rainbow-colored heart. (Id.) Spectrum is a support group for Arconic employees who identify as LGBTQ+. (Id.)

While working an overnight shift on June 2 and 3, 2021, Snyder posted the following statement to Arconic's intranet: "Its a (sic.) abomination to God. Rainbow is not meant to be displayed as a sign for sexual gender." (ECF 25-1, ¶ 5.) The parties dispute his intent, with Arconic alleging that Snyder was objecting to the LGBTQ+ community's use of the rainbow symbol, whereas Snyder asserts that he was objecting to *Arconic*'s use of the rainbow symbol. (Id.) The parties also dispute Snyder's belief as to who would be able to read his statement. Snyder asserts that he thought he was making an anonymous and private response to the Arconic survey. (ECF 23-2, ¶ 11.) By contrast, Arconic asserts that Snyder made the post to a page that "contained no link, no survey questions, he did not have to enter his employee ID, and there was nothing on the page to suggest it was seeking input about Pride Month or the LGBTQ community or anything of the sort." (ECF 22-2, ¶ 6.) Regardless, it is undisputed that Snyder's message was not anonymous

2

or private and instead was posted to the company intranet, which is accessible globally by over 13,000 employees. (ECF 25-1, ¶¶ 5, 7.) Prior to posting the message, Snyder had never expressed concern about the use of the rainbow symbol to Arconic. (Id., ¶ 15.)

Snyder's message remained on the Arconic intranet for hours, although the parties disagree on how many: Snyder says it was "eight hours, at most" (ECF 23-2, ¶ 21), while Arconic says it was "at least eight hours" (ECF 24-1, ¶ 21). Either way, it appears to be undisputed that Arconic removed the message sometime around 7 or 8 a.m. on June 3. (Id.)[2] It was removed because a management-level employee brought it to the attention of Arconic's Human Resources Director, "who had it removed within minutes." (Id.) Arconic contends that Snyder's message had approximately 240 views before it was removed. (ECF 25-1, ¶ 8.) Snyder asserts that there were approximately 240 views of the *intranet page*, but this does not mean all 240 people read his message. (Id.) He further submits that it is unclear when these views occurred—i.e., whether they were before or after the message. (Id.) In Snyder's view, it is "impossible to determine" whether anyone saw his message. (Id.)

Arconic began an investigation into Snyder's message on either June 6, 7, or 8, 2021. (ECF 24-1, ¶ 17.) Arconic asserts that at least three employees saw Snyder's message and found it offensive before it was taken down. (Id., ¶¶ 21, 22.) Arconic further asserts that other employees also considered the message offensive when it was shared with them during the investigation. (Id., ¶¶ 22, 23.) Arconic's investigators did not interview employees en masse about the message, although investigators "were aware others had expressed concern about the offensive comment, and all testified the comment was offensive to them." (Id., ¶ 23.) Arconic was not aware of any work disruption resulting from Snyder's message, although its investigators "found the comment offensive and a comment which could subject the company to liability." (Id., ¶ 24.)

Snyder communicated to investigators that his message was based on his religious beliefs. (Id., ¶ 26.) Specifically, Snyder told Human Resources that Arconic "was not considering his feelings and religious beliefs in using the rainbow to promote 'Gay Pride Month.'" (ECF 25-1, ¶ 16.) He added: "If any one of you in this meeting believes in God, you know that my statement is

---

[2] Arconic's Response to Snyder's Statement of Undisputed Facts did not specifically admit or deny the factual assertion that the statement was removed around 7 or 8 a.m., and thus the Court treats it as undisputed. *See* Fed. R. Civ. P. 56(e). The Court likewise treats facts as "undisputed" in other places where one side or the other purported to "deny" an entire paragraph but only provided support for the denial as to some *portion* of the paragraph. *See id.* In these circumstances, the correct nomenclature would have been that the statement is "admitted in part and denied in part." Consistent with Rule 56(e), the Court will treat the unaddressed portions of these paragraphs as undisputed.

true." (Id.) Snyder also asserts that he said, "what about my beliefs and opinions?" during one of his meetings with investigators. (ECF 24-1, ¶ 39.) Arconic concedes that Snyder's message on the intranet page was religiously motivated (id., ¶ 26), although Arconic's corporate representative deponent, Jorge Rodriguez, testified: "I don't see [Snyder's statement] as religious. I think Mr. – Mr. Snyder – Mr. Snyder's expression was of hatred. I have my personal beliefs about what it is to be religious" (id., ¶ 28). Rodriguez also testified that, in his view, it is not religious to make a hateful comment or call a person an abomination. (Id.)

Arconic has a People Value and Policy on Diversity in the Workplace policy, as well as a Guide to Business Conduct, Arconic Code of Conduct, and anti-harassment policy. (ECF 25-1, ¶ 17.) Employees are to "set an example by fostering a fair, respectful, and inclusive work environment" and promote "an inclusive environment of respect, honesty, transparency, and accountability." (Id., ¶ 18.) Arconic defines harassment, in part, as written material that "denigrates or shows hostility or aversion toward a person or group because of any protected characteristic" and "sharing unsolicited opinions about a person's sexual orientation or gender identity and expression." (Id., ¶ 19.) Arconic's policy notes that harassment includes circulating written material in the workplace that "denigrates or shows hostility or aversion toward a person or group because of any characteristic protected by law." (Id., ¶ 20.) Arconic does not tolerate "conduct that denigrates or shows hostility or aversion towards someone because of" a protected characteristic, such as conduct that creates an intimidating, hostile, or offensive work environment. (Id., ¶ 21.) Arconic believes that "an accommodation to state offensive comments to others would not be reasonable" but admits there is no evidence that it considered other alternatives after Snyder's message on the company intranet. (ECF 24-1, ¶ 35.)

Snyder never asked for his message to be put back on the company intranet after it was removed, but he also testified that he stands by it and would never take it back. (Id., 33; ECF 25-1, 13.) In an email to the union representative on June 10, Snyder said: "I will never take place [sic.] in any of their surveys or give my opinion to their solicitations" again. (ECF 24-1, ¶ 32.) At the end of Arconic's investigation into Snyder's message, the company terminated him. (Id., ¶ 20.) The parties agree that Snyder was fired because of the message, although they disagree about how this should be characterized: Snyder says he was terminated because he made a religiously motivated statement (id., ¶ 1), while Arconic says he was terminated for violating company policy

4

(ECF 25-1, ¶ 24.) Snyder had been disciplined on two other occasions for violating the same company policy in the year immediately preceding his termination. (Id., ¶ 25.)

## II. Legal Analysis.

### A. Motion for Summary Judgment Standard.

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach*, 359 F. Supp. 3d at 614.

### B. Legal Standards and Principles: Title VII and Iowa Civil Rights Act.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discharging, adversely affecting, or otherwise discriminating against an employee "because of" the employee's religion. 42 U.S.C. § 2000e-2(a). Under Eighth Circuit precedent, "[a]n employee establishes a prima facie case of religious discrimination by showing that: (1) the employee has a bona fide religious belief that conflicts with an employment requirement; (2) the employee informed the employer of this belief; (3) the employee was disciplined for failing to comply with the conflicting employment requirement." *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1340 (8th Cir. 1995).[3] "If the plaintiff establishes a prima facie case, then 'the burden shifts to the employer to produce evidence showing that it cannot reasonably accommodate the employee without incurring undue hardship.'" *Mial v. Foxhoven*, 305 F. Supp. 3d 984, 990 (N.D. Iowa 2018) (quoting *Cook v. Chrysler Corp.*, 779 F. Supp. 1016, 1022 (E.D. Mo. 1991)). An "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023). This is a "fact-specific inquiry." *Id.*

---

[3] In *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, the Supreme Court clarified that an employer need not know with certainty that the conflict arises out of a religious belief; some lesser showing is sufficient so long as the employer takes action "with the *motive* of avoiding the need for accommodating a religious practice." 575 U.S. 768, 774 (2015).

5

"Undue hardship requires more than proof of some fellow-worker's grumbling . . . An employer. . . . would have to show . . . actual imposition on co-workers or disruption of the work routine." *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (quoting *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978)). "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual . . . because of such individual's religious observance and practice." *Abercrombie & Fitch*, 575 U.S. at 775 (internal punctuation omitted).

Like Title VII, the Iowa Civil Rights Act ("ICRA") prohibits an employer from discharging or discriminating against an employee "because of" religion. Iowa Code § 216.6(1)(a). The Iowa Supreme Court follows the same burden-shifting approach in religious discrimination cases under the ICRA as federal courts follow under Title VII. *King v. Iowa Civ. Rts. Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983). For simplicity, this Order will use "Title VII" to refer to both Snyder's federal and state law claims, as they rise and fall together.

Snyder has not provided any evidence that Arconic employees who made comments expressing hostility toward protected groups for non-religious reasons were punished less severely than him. He is therefore not bringing what some courts characterize as a "traditional" disparate treatment claim. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1272 (11th Cir. 2021). Instead, his religious discrimination claim is based on what the Supreme Court has called a "disparate-treatment claim[] based on a failure to accommodate a religious practice." *Abercrombie & Fitch*, 575 U.S. at 773.

Although he gives it relatively little attention in his briefs, Snyder also asserts a claim for retaliation in violation of 42 U.S.C. § 2000e-3(a). To prove a prima facie case of retaliation, Snyder must prove: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the two. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015). "To show a causal connection, [Snyder] must show that [his] protected activity was a but-for cause of [his] employer's adverse action." *Id.*

### C. The Court Denies Snyder's Motion for Partial Summary Judgment Because Snyder Has Failed to Prove Two of the Elements of a Prima Facie Case Under Title VII.

The two sides approach the relevant legal question from starkly different positions. Arconic focuses on the elements of a prima facie case for religious discrimination, which it argues Snyder

has not satisfied. Snyder views the case through a simpler lens: he argues that Arconic terminated him for posting a religiously motivated message on the company intranet, and thus this is a straightforward case of termination "because of" religion. The Court concludes that Arconic's approach aligns with binding Eighth Circuit precedent. It further concludes that the facial simplicity of Snyder's position breaks down under scrutiny, as he simply has not satisfied the elements of a prima facie case under Title VII.

1. <u>Snyder Has Not Established a "Conflict" Between His Religious Practices and Arconic's Requirements.</u>

Under well-established Eighth Circuit precedent, an employee must show, *inter alia*, "a bona fide religious belief that conflicts with an employment requirement." *Wilson*, 58 F.3d at 1340. "[T]he word 'belief' here is really a shorthand for religious observances and practices that are manifestations of the employee's religious belief." *Equal Emp. Opportunity Comm'n v. Kroger Ltd. P'ship I*, 608 F. Supp. 3d 757, 776 (E.D. Ark. 2022). "Speaking metaphysically, a belief cannot conflict with a workplace rule. Instead, it is the religious observance or practice—i.e., doing something or refraining from doing something based on a religious belief—that can conflict with a workplace rule." *Id.*

In most reported cases, employees satisfy the "conflict" requirement by showing that their religion compels them to do one thing (like wear a headscarf or rest on the Sabbath) but their employer requires them to do something else (like working without headwear or on Sundays). *See, e.g.*, *Groff*, 143 S. Ct. at 2286; *Abercrombie & Fitch*, 575 U.S. at 770. Here, however, Arconic did not require Snyder to do anything. It did not, for example, compel him to wear a rainbow pin, march in a Gay Pride parade, or take any other action that he considered incompatible with his religious beliefs. *See, e.g.*, *Ollis v. HearthStone Homes, Inc.*, 495 F.3d 570, 575 (8th Cir. 2007) (employee established *prima facie* case because employer required him to engage in non-Christian religious activity during "Mind Body Energy" sessions, in conflict with his Christian faith). To the contrary, Arconic accommodated Snyder's religious beliefs by allowing him not to work on Sundays. At most, Arconic simply *forbade* Snyder (and all other employees) from making statements expressing hostility toward others, particularly those in protected groups.

Against this factual backdrop, Snyder struggles to articulate his position in a way that satisfies the elements of a prima facie claim. He seems to acknowledge, correctly, that Arconic does not run afoul of Title VII by having a policy that prohibits employees from making statements

7

in the workplace that express hostility toward the LGBTQ+ community or any other person or group. *See Wilson*, 58 F.3d at 1342 ("Title VII does not require an employer to allow an employee to impose his religious views on others.") He also appears to admit that he did not request an accommodation from this policy in advance of violating it. And while he argues that Arconic made no effort to accommodate him, his briefs are vague on what, exactly, he claims the company should have done. He merely cites his statement to the union representative that he would never again participate in an employment survey or provide his opinion. (ECF 23-1, p. 12.) Perhaps this means he believes Arconic should have accommodated him by allowing him to continue to work but taking away his right to respond to surveys or post on the company intranet. Alternatively, as his counsel suggested at the hearing on the cross-motions for summary judgment, perhaps the appropriate accommodation was to send Snyder home for the day and tell him to reflect on his statements. All the Court can tell for sure is that Snyder believes he should not have been terminated for what he characterizes as an "isolated" statement that he thought would be confidential. In essence, his position is that Title VII requires an employer to give at least "one free pass" to an employee who makes a statement that violates the employer's anti-harassment policy if the statement was motivated by sincere religious beliefs.

Snyder rests his "one free pass"[4] argument on the Supreme Court's admonition that "Title VII does not demand mere neutrality with regard to religious practices . . . . Rather, it gives them favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual . . . because of such individual's religious observance and practice." *Abercrombie & Fitch*, 575 U.S. at 775 (internal punctuation omitted). Snyder is taking this language out of context. Title VII mandates "favored treatment" when there is a conflict between religious practices and employment requirements. So, for example, in the absence of undue hardship, an employer must accommodate an employee's request for religious reasons not to work on Sundays even if the employer would not accommodate the same request by a different employee for non-religious reasons. *See Groff*, 143 S.Ct. at 2286. By contrast, Snyder has not cited—and the Court is not independently able to locate—a case holding that Title VII requires "favored treatment" in the absence of a conflict between a religious practice and an employment requirement.

---

[4] Snyder does not agree with the characterization of his position as a "one free pass" or "second chance" rule. The Court believes, however, that it is a fair characterization in a scenario where Snyder is not arguing that he should be *permitted* to post messages on the company intranet expressing hostility to the rainbow symbol, but rather that he should not have been *terminated* for doing so.

The law instead establishes the opposite: "[a]n employer's duty to accommodate cannot arise until an actual conflict between a religious belief, observance or practice and a job-related requirement is actually presented." *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 603 (W.D. Pa. 2009). In *Rose v. Midwest Express Airlines, Inc.*, for example, the District of Nebraska granted summary judgment for an employer who terminated an employee because it believed she was sleeping on the job. No. 8:01-CV-473, 2002 WL 31095361, at *3 (D. Neb. Sept. 19, 2002). The employee asserted that she was actually *praying* and therefore argued she had a viable Title VII claim for religious discrimination; i.e., she was terminated "because of" religion. *Id.* The District of Nebraska disagreed because, *inter alia*, the employee "offered no evidence that her religion required her to pray in a specific manner, at specific times, at specific places, or in specific circumstances." *Id.* In other words, there was no conflict between her religious practices and the employer's requirements. *Id.*

Similarly, in *O'Connor v. Lampo Grp., LLC*, the Middle District of Tennessee dismissed a Title VII case brought by an employee who was fired for having premarital sex, in violation of a company policy requiring behavior "consistent with traditional Judeo-Christian values or teaching." 3:20-CV-00628, 2021 WL 4480482, at *2 (M.D. Tenn. Sept. 29, 2021), *reconsideration denied*, No. 3:20-CV-00628, 2021 WL 4942869 (M.D. Tenn. Oct. 22, 2021). The employee argued that her religious beliefs did not prohibit premarital sex, and thus she was terminated "because of" religion in the sense that her beliefs conflicted with her employer's requirements. *O'Connor* held that this is not the type of "conflict" that gives rise to a Title VII claim. *Id.*, at *7. Rather, Title VII comes into play only when an employee's religious beliefs "proactively require or encourage" the employee to *do something* that the employer forbids or *refrain from doing something* that the employer requires. *Id.* Because the plaintiff in *O'Connor* was not required or encouraged by her religion to have premarital sex, she did not have a viable Title VII claim. *Id.*; *see also Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004) ("[W]e seriously doubt that the doctrines to which Peterson professes allegiance compel any employee to engage in either expressive or physical activity designed to hurt or harass one's fellow employees."); *Prise*, 657 F. Supp. 2d at 603–04 (granting summary judgment for employer in Title VII claim despite employee's religiously motivated concerns for how the company was being operated; the employee's religion did not require her to raise those concerns).

Although the Court has not located an Eighth Circuit case squarely on point in the context of Title VII, First Amendment free exercise cases are highly instructive because the "first amendment protects at least as much religious activity as Title VII does." *Brown*, 61 F.3d at 654. In *Altman v. Minnesota Department of Corrections*, the Eighth Circuit held that there must be an actual conflict between religious practices and employment requirements before an employee's free exercise rights have been violated. 251 F.3d 1199, 1204 (8th Cir. 2001). *Altman* held that an employer did not violate the free exercise clause by reprimanding the plaintiffs for reading their Bibles during a mandatory training session because the plaintiffs "do not suggest that their religion requires them to read the Bible while working. . . ." *Id. Altman* all but confirms that *Rose*, *O'Connor*, and similar cases correctly recognize the type of conflict that must exist under Title VII between religious practices and an employment requirement.

Here, Snyder has not argued—much less submitted evidence—that his religion requires him to send messages objecting to the use of rainbow imagery. It follows that there is no "conflict" in the legally relevant sense between his religious practices and Arconic's anti-harassment policy. Snyder appears to recognize as much, arguing that Title VII protections also apply in the case of indirect conflicts; i.e., when an employee does something that is not *per se* "required" by religion but nonetheless is motivated by religious beliefs. He has not, however, identified any authority for the proposition that the protections of Title VII extend to indirect religious conflicts in circumstances like those present here. Instead, *Altman* and the lower court cases identified above establish the opposite.

In arguing otherwise, Snyder relies heavily on the Eighth Circuit's decision in *Brown v. Polk County, Iowa*, arguing that it holds that Title VII prohibits an employer from terminating an employee for "spontaneous prayers, occasional affirmations of Christianity, and isolated references to Bible passages" even if those acts might be offensive to other employees. 61 F.3d at 656. (*See also* ECF 23-1, pp. 10, 18–20.) Careful review of *Brown* shows why Snyder is mistaken.

*Brown* involved an unusual fact pattern in which the employer had no policy prohibiting the employee's religious practices until after those practices already occurred, at which point the employer decided it did not like them. *See Brown v. Polk Cnty., Iowa*, 832 F. Supp. 1305, 1314, n. 17 (S.D. Iowa 1993), *aff'd sub nom. Brown v. Polk Cnty.*, 37 F.3d 404 (8th Cir. 1994), *reh'g granted and opinion vacated* (Nov. 25, 1994), *on reh'g en banc sub nom. Brown v. Polk Cnty., Iowa*, 61 F.3d 650 (8th Cir. 1995), and *aff'd in part, rev'd in part*, 61 F.3d 650 (8th Cir. 1995). Because the

10

employer later used the employee's religious conduct as a factor in terminating him, the district court concluded the employee had established a prima facie case of religious discrimination without applying the elements traditionally used in the Eighth Circuit. *See id.* The *en banc* Eighth Circuit followed suit, jumping almost immediately to the issues of accommodation and undue hardship without analyzing the elements of a prima facie case; indeed, the words "prima facie" are found nowhere in the opinion. *See Brown*, 61 F.3d at 653–54. In context, it was understandable why *Brown* did this: the employee's religious expressions consisted of isolated and spontaneous allusions to the Bible and Christianity that did not violate any established employer policies, yet the employer reprimanded and later fired him because of those expressions. *Id.* at 656–57. The employer therefore fired him "because of" religion, as opposed to firing him because of a violation of a religiously neutral policy. *Id.* The Eighth Circuit also clearly was troubled by other evidence of the employer's religious animus, such as a supervisor forcing the employee to remove all religious items from his office and directing him to "cease any activity that *could be considered* to be religious" regardless of whether it disrupted the workplace. *Id.* at 658–59.

*Brown* has little in common with the instant case. Unlike the employer in *Brown*, Arconic did not wait until Snyder engaged in religious activity and then retroactively implement and enforce a policy against it; instead, Arconic enforced an unambiguous and religiously neutral policy that existed all along. *See, e.g.*, *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination."); *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1286 (8th Cir. 1977) ("Blakely's discharge was caused by his violation of company rules of conduct. It was not the result of antagonism by Chrysler to his religious beliefs and did not violate Title VII."). Moreover, Arconic did not display other forms of religious animus. To the contrary, it accommodated Snyder's religious practices by not scheduling him to work on Sundays. It follows that, unlike *Brown*, there is no reason here to skip the traditional elements of a prima facie case, including the requirement that Snyder prove a conflict between his religious practices and Arconic's policy. *See Wilson*, 58 F.3d at 1340.

The Eighth Circuit has repeatedly required plaintiffs in post-*Brown* Title VII religious discrimination cases to establish the three elements of a prima facie case, including the conflict requirement. *See, e.g.*, *Ollis*, 495 F.3d at 575; *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir. 2003); *Vetter v. Farmland Indus., Inc.*, 120 F.3d 749, 751 (8th Cir. 1997). Indeed, *Brown* itself

11

recognized that a conflict is required, holding that some of the employee's conduct did not give rise to a viable Title VII claim, such as his use of a subordinate's time to type Bible study notes and his desire to have prayers in his office before the start of the workday. 61 F.3d at 656. The Eighth Circuit held that it "would be surprised if directing a county employee to type Bible study notes is 'conduct mandated by religious belief' . . . [and] nothing in Title VII requires that an employer open its premises for use before the start of the workday." 61 F.3d at 656 (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981)). The Court therefore does not interpret *Brown* as dispensing with the elements of a prima facie case under Title VII except in narrow circumstances where an employer retroactively creates and enforces a policy for the specific purpose of tamping down an employee's religious activity. Nothing of the sort occurred here. It follows that *Brown* does not require the Court to find a conflict between Snyder's religious practices and Arconic's employment requirements. Instead, Snyder bears the burden of establishing that element in some way beyond merely showing that his violation of Arconic's neutral policy was motivated by his religious beliefs. He has failed as a matter of law to do so.

    2. <u>Snyder Did Not Provide Adequate Notice to Arconic of the Putative "Conflict" Between His Religious Practices and Arconic's Policies.</u>

Even if Snyder could establish a "conflict" between his religious practices and Arconic's employment requirements, his attempt to prove a prima facie case runs into a second problem: Arconic was not reasonably on notice of the conflict or his need for an accommodation. "Title VII imposes a duty on the employer but also a reciprocal duty on the employee to give fair warning of the employment practices that will interfere with his religion and that he therefore wants waived or adjusted." *Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 935 (7th Cir. 2003); *see also Mann*, 561 F.2d at 1285 (describing an employee's duty under Title VII to cooperate with the employer to identify and address potential religious conflicts). It is undisputed that Snyder did not express concern about Arconic's anti-harassment policy or use of the rainbow symbol prior to posting his message, much less ask for an accommodation. Instead, Snyder's position is that he informed Arconic of the religious conflict as he was in the process of violating the policy by posting his message, and that he asked for an accommodation during the subsequent investigation.

Case law says Snyder was too late. In *Johnson v. Angelica Uniform Group, Inc.*, the Eighth Circuit affirmed judgment in favor of the employer in a Title VII claim because the employee did not say anything about his purported need to miss work for religious reasons until after his twelfth

12

absence. 762 F.2d 671, 673 (8th Cir. 1985); *see also Mann*, 561 F.2d at 1285–86 (similar). Similarly, in *Reed*, the Seventh Circuit affirmed summary judgment for an employer who fired an employee for storming out of a meeting even though the employee claimed he only did so because one of the attendees started praying. 330 F.3d at 933, 935–37. Title VII was not violated because the employee had done nothing to put the employer on notice that his religious beliefs might need to be accommodated. *Id.* at 935–36. In *Wilkerson v. New Media Technology Charter School Inc.*, the Third Circuit likewise affirmed the dismissal of a Title VII claim because the employee did nothing to notify the employer of a religious conflict until after her absence from a mandatory ceremony. 522 F.3d 315, 319 (3d Cir. 2008). Similar logic applies here. To the extent there is a conflict between Snyder's religious practices and Arconic's anti-harassment policy (or its use of the rainbow symbol), there is no evidence that Arconic knew or should have known in advance of this conflict or Snyder's need for an accommodation.

The Fourth Circuit's decision in *Chalmers v. Tulon Co. of Richmond* is particularly instructive. 101 F.3d 1012 (4th Cir. 1996). *Chalmers* involved a devout employee who was fired for writing private letters to two co-workers expressing concerns about what she perceived to be immoral conduct. *Id.* at 1015–16. The letters were overtly religious—e.g., "One thing the Lord wants you to do is get your life right with him"—and the employee's religious convictions were well known in the workplace before she sent them. *Id.* The Court held the employee had not established a prima facie claim of religious discrimination under Title VII because the employer had no notice "that her religious beliefs required her to write such letters" and thus no reason to know an accommodation might be necessary. *Id.* at 1020. *Chalmers* considered and rejected arguments akin to those Snyder raises here, including that the letters themselves provided notice of the need for an accommodation. *Id.* The Fourth Circuit disagreed, holding that "giving notice to co-workers at the same time as an employee violates employment requirements is insufficient to provide adequate notice to the employer and to shield the employee's conduct." *Id.* The employee also argued that the employer "should have attempted to accommodate her by giving her a sanction less than a discharge, such as a warning." *Id.* Again, the Fourth Circuit disagreed: "[t]here is nothing in Title VII that requires employers to give lesser punishments to employees who claim, after they violate company rules (or at the same time), that their religion caused them to transgress the rules." *Id. Chalmers* is squarely on point and defeats Snyder's position.

*Chalmers* relied in part on two Eighth Circuit cases—*Johnson* and *Brown*—and therefore appears to be consistent with Eighth Circuit precedent. Notwithstanding, Snyder also relies heavily on *Brown*, arguing that it establishes that Arconic was sufficiently on notice of his religious beliefs and need for an accommodation. *See Brown*, 61 F.3d at 654 ("Because the first reprimand related directly to religious activities by Mr. Brown, we agree with the district court that the defendants were well aware of the potential for conflict between their expectations and Mr. Brown's religious activities.").

The Court explained above that *Brown* involved unique facts and did not free plaintiffs from having to prove the existence of a conflict between religious practices and employment requirements except in narrow circumstances not present here. Those same unique facts show why *Brown* does not support Snyder's position that Arconic had adequate notice of his need for a religious accommodation from the anti-harassment policy. In *Brown*, the employer initially reprimanded the employee for his religious activities despite the absence of a policy against them. *Id.* at 652–53; *see also Brown,* 832 F. Supp. at 1314, n.17, *aff'd sub nom. Brown*, 37 F.3d 404, *reh'g granted and opinion vacated*, *on reh'g en banc sub nom. Brown*, 61 F.3d 650. Several months later, the employee was fired due, in part, to the same activities for which he already had been reprimanded. *Brown*, 61 F.3d at 654. There is nothing in the appellate or trial court opinions in *Brown* to suggest the employee engaged in any *new* religious activities; instead, he was reprimanded and terminated for the original incidents. Thus, when *Brown* held that the defendants were "well aware of the potential for conflict between their expectations and Mr. Brown's religious activities," *id.* at 654, it was simply recognizing the obvious fact that an employer who reprimands an employee for religious acts is already aware of a conflict before terminating him for those very same acts. Indeed, in those unique circumstances, the employer itself has created the conflict and then used it retroactively as a basis for termination. Nothing even remotely similar happened here.

*Brown* does, to be sure, also hold that an employee need not explicitly ask for an accommodation in order to establish a Title VII violation. *Id.* at 654. *Abercrombie & Fitch* reached essentially the same conclusion. 575 U.S. at 774. This is of no assistance to Snyder, however, because there is nothing in the record to suggest that Arconic suspected there might be a conflict between its anti-harassment policy (which, in relevant part, simply forbids employees from expressing hostility toward protected groups) and Snyder's religious practices. In fact, by his own account, Snyder only "informed" Arconic of the conflict when he was in the process of violating

the policy. Neither *Brown*, *Abercrombie & Fitch*, nor any other case cited by Snyder (or located by the Court) holds that this is enough to establish a prima facie case of religious discrimination. Instead, the law requires Snyder to prove Arconic's awareness that he needed an accommodation *before* he violated the policy. *See Johnson*, 762 F.2d at 673; *Chalmers*, 101 F.3d at 1020; *Rose*, 2002 WL 31095361, at *4. Snyder has failed as a matter of law to do so.

Finally, although it does not appear to be a disputed issue, the Court concludes that Arconic did not act unreasonably or in bad faith in concluding that Snyder's message violated Arconic's anti-harassment policy. The record shows that Snyder characterized the use of the rainbow symbol as an "abomination" on a companywide intranet page accessible by more than 13,000 employees. It is well known that the rainbow symbol is affiliated with the LGBTQ+ community, and thus Arconic reasonably interpreted Snyder's message as hostile to that community. True, Snyder says he meant to object to *Arconic*'s use of the rainbow symbol, rather than the *LGBTQ+ community*'s use of it. But Arconic uses it *because* the LGBTQ+ community uses it. Thus, regardless of Snyder's subjective intentions, Arconic could reasonably interpret his post as expressing hostility to a protected group in violation of company policy. *See McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009) (holding that the "critical inquiry" in an employment discrimination case is the employer's good faith belief about what occurred). It is equally immaterial that Snyder insists his message did not express hostility toward any particular person. Arconic could reasonably believe that some readers of Snyder's message would not appreciate the difference between referring to a *group of people* as an "abomination" versus referring to the *use of a symbol associated with that group* as an "abomination." Accordingly, again, Arconic could reasonably conclude that Snyder violated company policy.

The bottom line is that, unlike *Brown*, there is no reason in these circumstances to skip over the traditional elements of a prima facie religious discrimination case. Instead, Snyder must show, *inter alia*, a conflict between his religious practices and an employment policy and Arconic's awareness of that conflict before Snyder violated the policy. Snyder cannot satisfy these elements, particularly when the Court resolves factual disputes in Arconic's favor, as it must on Snyder's Motion for Partial Summary Judgment. In that scenario, the facts show that Snyder: (i) violated the company's anti-harassment policy by intentionally posting a message expressing hostility toward a protected group on a widely accessible intranet page, despite (ii) never identifying a religious belief or practice that conflicted with the anti-harassment policy or (iii)

placing Arconic on notice, in advance, of his need for an accommodation from that policy, and (iv) did so in a situation where he had already violated the same policy two other times in the preceding twelve months. These facts are more than enough to require denial of Snyder's Motion for Partial Summary Judgment. *See Johnson*, 762 F.2d at 673; *Chalmers*, 101 F.3d at 1020.

    *D. The Court Grants Arconic's Motion for Summary Judgment.*

    The analysis is more complicated when factual disputes are resolved in Snyder's favor, as they must be on Arconic's Motion for Summary Judgment. In this scenario, a schism develops between what Snyder says he *thought* he was doing when he posted his message versus what he *actually did*. Snyder claims he thought he was submitting a confidential response to an anonymous workplace survey. If this was all he did, he might have a valid Title VII claim. An employer presumably cannot invite employee feedback on workplace issues but then terminate an employee for providing such feedback based on the employee's religious beliefs. In *Altman*, for example, the Eighth Circuit held that triable issues existed where the employer disciplined two employees for reading Bibles during a mandatory training but had never disciplined employees who engaged in non-religious activities like sleeping or reading magazines. 251 F.3d at 1202–03.

    The undisputed fact, however, is that Snyder did *not* submit a confidential response to an anonymous workplace survey. Instead, he posted a message on an intranet page accessible by 13,000 employees characterizing the use of the rainbow symbol in connection with sexual orientation or gender as an "abomination." Moreover, he has not presented evidence that other employees were disciplined less harshly (or not at all) for inadvertently posting messages on the companywide intranet in violation of company policy. Finally, as explained above, Arconic reasonably viewed Snyder's message as expressing hostility toward a protected group and therefore violating company policy regardless of his subjective intent. In these circumstances, the Court must decide whether Arconic was required to view Snyder's message from the standpoint of what he claims he was trying to do instead of what he actually did.

    The Court is unable to find much case law directly on point, although the District of Nebraska's decision in *Rose* is highly similar in that a factual dispute existed between what the employer thought the employee was doing (sleeping) versus what the employee claimed she was doing (praying). 2002 WL 31095361, at *3–4. *Rose* nonetheless concluded that summary judgment was appropriate on the employee's Title VII religious discrimination claims. *Id. Rose* explained that even if the employee truly was praying, she had not established a conflict between her religious

practices and the employer's requirements, nor had she provided timely notice of her need for an accommodation. *See id.*

*Rose* is consistent with analogous and well established Eighth Circuit precedent holding that an employer does not violate federal anti-discrimination laws by making decisions based on a reasonable *perception* of what happened even if that perception turns out to be incorrect. In *Mershon v. St. Louis University*, for example, the Eighth Circuit affirmed summary judgment in favor of a university that banned a disabled student from campus for making what was perceived as a threatening phone call. 442 F.3d 1069, 1074–75 (8th Cir. 2006). The student admitted to making the call but denied making any threats, so *Mershon* assumed for purposes of summary judgment that he never threatened anyone. *Id.* at 1075. Still, *Mershon* held that no triable issue existed because "the University reasonably believed and acted upon [the phone call recipient's] report and her perception that [the plaintiff] had made a threat against a faculty member." *Id.*

Similarly, in *Scarborough v. Federated Mutual Insurance Co.*, the employee was terminated for lying about his awareness of another employee's financial misconduct, as well as other conduct showing a lack of professionalism and integrity. 996 F.3d 499, 507 (8th Cir. 2021). The employee denied all allegations of misconduct and argued he was actually terminated in retaliation for *reporting* misconduct, in violation of state whistleblower laws. *Id.* The Eighth Circuit affirmed summary judgment for the employer, holding that it did not matter whether the employee lied or engaged in misconduct so long as the employer reasonably *believed* he had. *Id.* "[T]he key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred." *Id.* (quoting *Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 527 (8th Cir. 2017)); *see also McCullough*, 559 F.3d at 861–62 ("The critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.").

This case presents an interesting twist on *Mershon*, *Scarborough*, and similar cases because the only dispute is about what Snyder intended, not what actually happened. The Court concludes that this makes summary judgment even more appropriate here than it was in those cases. If an employer is permitted to make decisions based on its reasonable belief about what occurred even if that belief might be mistaken, surely an employer is likewise permitted to make decisions based on what unmistakably *did* occur, regardless of whether the employee intended something different.

17

*See, e.g. McCullough*, 559 F.3d at 861–62. Regardless of his subjective intent, Snyder posted a companywide message accessible to 13,000+ employees that Arconic reasonably interpreted as an expression of hostility toward a protected group in violation of the company's anti-harassment policy. He did so without making Arconic aware that his religious beliefs conflicted with the policy or that he needed an accommodation. Even when the facts are interpreted in the light most favorable to Snyder, Arconic did not violate Title VII by choosing to terminate him for this violation because, again, Snyder cannot establish the elements of a prima facie case. *See Johnson*, 762 F.2d at 673; *Chalmers*, 101 F.3d at 1020; *Rose*, 2002 WL 31095361, at *3–4.

It is important to keep in mind the Eighth Circuit's repeated admonition that it is not the Court's role in a Title VII case to "sit as a super-personnel department that reexamines an entity's business decisions." *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998). The Court is therefore not evaluating whether it was a good idea for Arconic to terminate Snyder, whether some lesser punishment might have been more appropriate, or even whether Snyder's conduct actually violated the anti-harassment policy. *See Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir. 2005) (affirming summary judgment for employer despite alleged unfairness of decision to fire employee for purportedly minor violation). Snyder is essentially asking the Court to disregard this well-established precedent, as his claims revolve almost entirely around what happened *after* he posted his message on the company intranet, with a particular focus on whether Arconic should have imposed some form of discipline short of termination. It is not the Court's prerogative to tell an employer how a violation of company policy should be addressed. *See id.*

Finally, although already embedded in the Court's discussion above, two other issues warrant attention. First, Snyder repeatedly argues that, in the aftermath of *Abercrombie & Fitch*, an employer cannot terminate or discipline an employee for violating a generally applicable policy if the violation is prompted by religious beliefs. (ECF 25, pp. 7–8; ECF 28, p. 2.) This is a misreading of the case. *Abercrombie & Fitch* does not purport to prohibit an employer from terminating someone for violating a religiously neutral policy if, *inter alia*: (i) the policy does not conflict with the requirements of the employee's religion; and/or (b) the employer did not have reason to believe there was a conflict and need for accommodation. The case does not, for example, suggest that an employer who requires employees to treat people courteously cannot discipline someone who walks up to a co-worker or customer, sees them wearing a rainbow pin, and spontaneously says, "the use of that symbol is an abomination to God." Instead, the Supreme Court

18

left intact the prima facie test applied by the Eighth Circuit and other courts of appeal except in the limited sense of clarifying that an employer need not have actual knowledge of the need for an accommodation before being obligated to provide one (which the Eighth Circuit already recognized in *Brown*). *Abercrombie & Fitch* therefore does not save Snyder's claims from summary judgment.

Second, the Court's analysis above applies with equal force to Snyder's Title VII retaliation claim, which requires him to prove a causal connection between an adverse employment action and protected religious conduct. *Shirrell*, 793 F.3d at 888. Snyder gives relatively little attention to the retaliation theory in his briefs, merely arguing that he was fired for engaging in two forms of protected conduct: (1) "expressly opposing Arconic's use of the rainbow to promote 'Pride Month' via his single religious comment on the company intranet;" and (2) "opposing Arconic's suspension and termination of his employment based on his religious comment." (ECF 25, p. 19.) Both parts of his argument are fatally flawed.

As to the first, Snyder is again approaching the situation from the perspective of what he says he *subjectively intended* instead of what he *actually did*. An employer is not required under Title VII to make employment decisions through such a lens. *See Scarborough*, 996 F.3d at 507; *Mershon*, 442 F.3d at 1074–75; *McCullough*, 559 F.3d at 861–62; *Rose*, 2002 WL 31095361, at *3–4. Rather, Arconic was allowed to terminate Snyder based on its reasonable belief that he violated company policy by posting a widely accessible message that the company interpreted as expressing hostility toward a protected group.

The second part of Snyder's retaliation argument is self-defeating. He argues that he engaged in protected conduct by opposing Arconic's decision to suspend and terminate him for his religiously motivated message. If so, this means his protected conduct was a *response* to an adverse employment action, rather than a but-for cause of it. He does not have a viable Title VII retaliation claim in these circumstances. *See Shirrell*, 793 F.3d at 888 (affirming summary judgment for employer where employee could not establish but-for causation). Instead, Snyder's Title VII claim rises or falls under his disparate treatment/failure to accommodate theory.

E. *The Court Need Not Reach the Issue of Undue Hardship.*

Because Snyder has failed as a matter of law to establish a prima facie case under Title VII, the Court need not decide whether it would create an undue hardship for Arconic to provide an accommodation. It bears repeating, however, that the Court is not sure what accommodation

Snyder even wants. He suggests the accommodation should involve a restriction on his ability to post messages on the company intranet page, but this suggestion exposes his failure to prove a prima facie case. If Snyder felt compelled by his religious beliefs to post the message on the company intranet page (or, in his version of the facts, to submit the message in response to the anonymous survey), it would not make sense for him to propose, as an accommodation, that he no longer be permitted to post such messages (or respond to surveys). The requested accommodation would both (i) confirm the violation of company policy and (ii) show it was not caused by any religious requirement.

Snyder alternatively suggests that he should have been disciplined in some way short of termination, such as being sent home for reflection. This, too, confirms his failure to prove a prima facie case. Arconic could not have been on notice that he needed an accommodation for his religious beliefs—much less have *provided* the accommodation—in a situation where the accommodation, by definition, could not have existed until after the policy violation. *See Wilkerson*, 522 F.3d at 319 ("Although [the employee] told [the employer] after the fact, at that time there was nothing to accommodate."). In essence, Snyder is asking this Court to conclude he was punished too harshly for his conduct and should have received some lesser penalty. Title VII does not give the Court the authority to make this sort of judgment. *See Torlowei*, 401 F.3d at 935.

### III. Conclusion.

Even when factual disputes are resolved in his favor, Snyder has failed to satisfy two of the elements of a prima facie case for religious discrimination under Title VII of the Civil Rights Act of 1964 and the Iowa Civil Rights Act. The Court therefore DENIES Snyder's Motion for Partial Summary Judgment and GRANTS Arconic's Motion for Summary Judgment. The Clerk of Court is directed to enter judgment for Defendants.

**IT IS SO ORDERED.**

Dated: August 31, 2023.

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE